## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------------x

NVR, INC., a Virginia corporation,      :    **ECF CASE**

             Plaintiff,      :    Civ A. No.

    - against -      :

JONATHAN DAVERN, an individual,      :

            Defendant.      :

-------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF NVR, INC.'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION EXPEDITED DISCOVERY, AND PRESERVATION ORDER

Dated: July 2, 2015

*Of Counsel:*
     James S. Yu
     Barry J. Miller (*Pro Hac Vice* To Be Filed)

SEYFARTH SHAW LLP

620 Eighth Avenue
New York, New York 10018
(212) 218-5500

Attorneys for Plaintiff
NVR, Inc.

## TABLE OF CONTENTS

Page

Table of Authorities ................................................**Error! Bookmark not defined.**

INTRODUCTION ...................................................................................1

STATEMENT OF FACTS .......................................................................3

   I.    NVR'S BUSINESS .....................................................................3

   II.   NVR'S CONFIDENTIAL AND PROPRIETARY
        INFORMATION ........................................................................4

   III.  DAVERN'S EMPLOYMENT WITH NVR.............................................9

   IV.  DAVERN'S RESIGNATION FROM NVR............................................10

   V.   DAVERN'S THEFT OF NVR'S CONFIDENTIAL
        INFORMATION ......................................................................11

ARGUMENT...........................................................................................15

   I.    EMERGENCY INJUNCTIVE RELIEF IS NECESSARY TO
        MAINTAIN THE STATUS QUO. ...........................................15

   II.   NVR IS LIKELY TO SUCCEED ON THE MERITS OF ITS
        CLAIMS. ..................................................................................16

        A.   NVR Is Likely To Succeed On Its Misappropriation
             Claim........................................................................17

        B.   NVR Is Likely To Succeed On the Merits Of Its Breach
             Of Contract Claims. ................................................20

            (1)   Davern's Breach of The Confidentiality
                  Obligations In The Code of Ethics. ...............................21

            (2)   Davern's Failure To Return Confidential
                  Information And NVR Property.....................................22

        C.   NVR Is Likely To Succeed On Its Claims Under The
             Computer Fraud And Abuse Act And New Jersey's
             Computer Related Offenses Act. ...............................23

## TABLE OF CONTENTS (continued)

Page

D.   NVR Is Likely To Succeed On Its Breach of Fiduciary Duty Claim. ..............................................................................27

E.   NVR Is Likely To Succeed On Its Unfair Competition Claim. .......................................................................................28

III.   NVR WILL CONTINUE TO SUFFER IRREPARABLE HARM IF THIS COURT DOES NOT GRANT INJUNCTIVE RELIEF. ..........29

IV.   DEFENDANT WILL SUFFER NO HARM IF THE INJUNCTION IS GRANTED. ...............................................................31

V.   ENFORCEMENT OF DAVERN'S OBLIGATIONS TO NVR IS NECESSARY TO PROTECT AND FURTHER THE PUBLIC INTEREST. ...........................................................................................32

VI.   NVR IS ENTITLED TO EXPEDITED DISCOVERY AND A PRESERVATION ORDER. .................................................................33

CONCLUSION....................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

ACE Am. Ins. Co. v. Wachovia Ins. Agency, Inc.,
  2008 WL 4630486 (D.N.J. Oct. 17, 2008) ...........................................................32

Better Packages, Inc. v. Zheng,
  No. 05-4477, 2006 WL 1373055 (D.N.J. May 17, 2006) ..................................35

Bimbo Bakeries USA, Inc. v. Botticella,
  613 F.3d 102 (3d Cir. 2010) ...............................................................................30

Civic Ctrs. Motors v. Paragon Honda,
  387 F. Supp. 2d 378 (S.D.N.Y. 2005) ................................................................26

Commodity Futures Trading Commission v. Krysinski,
  No. 03-C-8571, 2003 WL 23195535 (N.D. Ill. Dec. 1, 2003) ..........................34

Edudata Corp. v. Scientific Computers, Inc.,
  599 F. Supp. 1084 (D. Minn. 1984) ....................................................................34

Ellsworth Assocs., Inc. v. United States,
  917 F. Supp. 841 (D. D.C. 1996) ........................................................................34

Expediters Int'l of Wash., Inc. v. Direct Line Cargo Mgmt. Servs., Inc.,
  995 F. Supp. 468 (D.N.J. 1988) ..........................................................................18

Faively Trans. Malmo AB v. Wabtc Corp.,
  559 F.3d 110 (2d Cir. 2009) ...............................................................................29

FMC Corp. v. Taiwan Tainan Giant Indus. Co.,
  730 F.2d 61 (2d Cir. 1984) .................................................................................30

Givaudan Fragrances Corp. v. Krivda,
  Civ. A. No. 08-4409 (PGS), 2010 WL 1644070 (D.N.J. Apr. 22, 2010).....26, 35

Graco, Inc. v. PMC Global, Inc.,
  No. 08-1304, 2011 WL 2868930 (D.N.J. Feb. 14, 2011)...................................35

Hoffman-LaRoche, Inc. v. Genpharm, Inc.,
  50 F. Supp. 2d 367 (D.N.J. 1999) .......................................................................28

i

Ingersoll-Rand Co. v. Ciavatta,
   110 N.J. 609 (1988) ......................................................................28, 32

Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Americas,
   74 A.D.3d 696, 904 N.Y.S.2d 46 (1st Dep't 2010)............................29

Kos Pharm., Inc. v. Andrx Corp.,
   369 F.3d 700 (3d Cir. 2004) .............................................................15

Lamorte Burns & Co., Inc. v. Walters,
   167 N.J. 285 (2001) ........................................................18, 19, 22, 27

Latuszewski v. Valic Fin. Advisors, Inc.,
   2007 WL 4462739 (W.D. Pa. Dec. 19, 2007)...................................20

Mailman, Ross, Toyes & Shapiro v. Edelson,
   183 N.J. Super. 434 (Ch. Div. 1982)................................................28

Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.,
   219 N.J. Super. 158 (App. Div. 1987)...............................................29

National Reprographics, Inc. v. Strom,
   621 F. Supp. 2d 204 (D.N.J. 2009)...........................................16, 17, 21, 29, 32

Neo Gen Screening, Inc. v. Telechem International, Inc.,
   69 Fed. Appx. 550 (3d Cir. 2003)......................................................30

Oburn v. Shapp,
   521 F.2d 142 (3d Cir. 1975) .............................................................17

Opticians Ass'n of Am. v. Indep. Opticians of Am.,
   920 F.2d 187 (3d Cir. 1990) .............................................................15

P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore,
   L.L.C., No 04-4554 (JAG), 2007 WL 708978 (D.N.J. Mar. 5, 2007) ...............27

Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,
   143 F.3d 800 (3d Cir. 1998) .......................................................16, 29

Platinum Mgmt., Inc. v. Dahms,
   285 N.J. Super. 274 (1995)...............................................................19

Richards Mfg. Co. v. Thomas & Betts Corp.,
    2005 WL 2373413 (D.N.J. Sept. 25, 2005.)........................................................17

Schmidinger v. Welsh,
    243 F. Supp. 852 (D.N.J. 1965)..........................................................................28

**STATUTES**

18 U.S.C. § 1030 *et seq.*.............................................................................23, 24, 26

N.J.S.A. 2A:38A-3 .............................................................................................24

N.J.S.A. 56:15-1, et seq. ...................................................................17, 18, 19, 32

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(d) ..........................................................................................34

Fed. R. Civ. P. 65 ................................................................................................1

Restatement (Second) of Agency § 395 (1958).......................................................22

Plaintiff NVR, Inc. ("NVR" or "Plaintiff"), by and through its attorneys, Seyfarth Shaw LLP, respectfully submits this memorandum of law in support of its motion for a temporary restraining order ("TRO") and preliminary injunction against Defendant Jonathan Davern ("Davern" or "Defendant"), pursuant to Rule 65 of the Federal Rules of Civil Procedure. NVR also seeks expedited discovery and a preservation order in advance of its hearing on this motion for preliminary injunction.

## INTRODUCTION

NVR, one of the nation's leading homebuilders, brings this emergency motion to protect against the irreparable harm it is suffering as a result of defendant Davern's blatant misappropriation of its confidential and trade secret information. Indeed, NVR recently learned that Davern, in the days leading up to his abrupt resignation, mass-emailed to his personal account, without NVR's authorization, substantial quantities of highly confidential and proprietary documents -- at least 50 emails and attachments -- relating to, among other things, lot costs; developer information; timing estimates; NVR bids on various projects; costs to build homes; profit percentages and data that is essential in NVR's analysis of a land development project and putting together bids for a land deal (the "Land Files"); and NVR employee compensation information.

Given Davern's imminent departure, he had absolutely no legitimate business purpose for transmitting these confidential documents to his personal email account. And, given that Davern had been employed with NVR for over ten years and was privy to all aspects of its business, particularly within NVR's Central and South New Jersey Divisions where he worked, Davern knows that NVR's confidential information, and particularly its Land Files, are extremely valuable to NVR and its competitive advantage in the homebuilding industry. Accordingly, Davern's foregoing nefarious conduct is a direct violation of NVR's Code of Ethics, which contains, among other things, provisions regarding the use and protection of confidential information; NVR's technology policies governing the use and treatment of emails and electronic data containing confidential information; and his statutory and common law obligations to NVR.

Furthermore, upon information and belief, Davern transmitted the foregoing confidential information with the intent to misuse it for his personal gain. Indeed, at the time that Davern transmitted the confidential documents to his personal email account, upon information and belief, Davern had been offered employment by D.R. Horton, Inc. ("Horton"), one of NVR's largest direct competitors, and was already planning his departure from NVR. Moreover, NVR is informed and believes that Davern was also responsible for the loss and corruption of certain data and files from NVR's servers two weeks prior to his resignation.

Based upon the foregoing, NVR seeks immediate injunctive relief arising from the imminent threat of irreparable harm caused by Davern's manifest violation of his contractual and other legal obligations to NVR. The requested injunction is very limited and narrow in scope. All that NVR seeks, consistent with the NVR Code of Ethics to which Davern is bound, is an order enjoining Davern and all those acting in active concert or participation with him from (1) accessing, using or disclosing any of NVR's confidential and trade secret information; and (2) soliciting any current NVR employees or otherwise encouraging, inducing and/or facilitating NVR employees to leave NVR using NVR's confidential information. In addition, NVR seeks expedited discovery in order to determine the whereabouts and secure the return of all NVR documents, files, and other property, including its confidential information, within Davern's possession or control, or which he may have transmitted to third parties.

## STATEMENT OF FACTS

### I. NVR'S BUSINESS

NVR is in the business of selling and constructing homes and operates its business under the Ryan Homes, NVHomes, Fox Ridge Homes and Heartland Homes trade names. NVR homebuilding operations serve 27 metropolitan areas in fourteen states, including Maryland, Virginia, West Virginia, Pennsylvania, New York, New Jersey, Delaware, Indiana, Illinois, Ohio, North Carolina, South

Carolina, Florida and Tennessee, as well as Washington D.C.  NVR's sub-entity, Ryan Homes has constructed more than 345,000 homes since it was founded in 1948.  Today, Ryan Homes offers housing styles to suit a wide range of consumers' needs, including single-family, townhouse or garden condominium. NVR's sub-entity NVHomes offers additional architectural details and designer elements tailored to suit the most discriminating of tastes. Established in 1980, NVHomes has earned a reputation for luxury, quality and value.  (Declaration of Dylan Sinclair ("Sinclair Decl.") ¶ 3-6.)

NVR also operates a business in mortgage banking, operating branches in the metropolitan areas in which NVR has homebuilding operations.  NVR Mortgage's primary focus is to serve the needs of NVR homebuyers.  (Id. ¶ 7.)

## II.   NVR'S CONFIDENTIAL AND PROPRIETARY INFORMATION

An essential aspect of NVR's business model is to evaluate potential land opportunities, analyze and determine lot costs, developer information, timing estimates, costs to build homes and profit percentages and, premised upon this information, put together a bid to the developer of proposed cost and option terms for the project. (Id. ¶ 9.)  Then, if and when NVR's bid is chosen, NVR continues to evaluate and analyze the project, including the timeline, costs and profit margins through completion.  (Id. ¶ 10.)  Accordingly, the Land Files reflecting NVR's

analysis and evaluation of both potential and closed land deals contain highly sensitive information on which NVR's entire business model is based. (Id. ¶ 11.)

Because the foregoing information provides NVR with a competitive advantage, NVR closely guards and takes extra steps to protect against the unauthorized dissemination of the confidential and trade secret information. Declaration of David Whitaker ("Whitaker Decl.") ¶ 4. With respect to any such information stored electronically on NVR's servers and other NVR owned electronic storage devices, only certain current employees of NVR have access to such information through authorized usernames and passwords. (Id.)

Furthermore, in order to protect its confidential and trade secret information from unauthorized disclosure, dissemination or misuse, each of NVR's employees, including Davern, is required to consent to NVR's Code of Ethics, which contains, among other things, certain express provisions governing the access, use, treatment and protection of NVR's confidential and trade secret information. Sinclair Decl. ¶ 12. The Code of Ethics is updated from time to time and distributed annually to all NVR employees. The most recent version of the Code of Ethics distributed to Davern states in relevant part:

> Employees of NVR must maintain the confidentiality of information entrusted to them by NVR or its customers, except when disclosure is either expressly authorized by NVR or required by law. Confidential information includes all non-public information, including, but not limited to, information that might be of use to

competitors, or harmful to NVR or its customers, if disclosed. It also includes information that suppliers and customers have entrusted to us. NVR requires that each employee preserve NVR's confidential information even after his or her employment or relationship with NVR ends. Disclosure of NVR's confidential information, even after termination of employment, may result in civil, or in some cases, criminal liability for the individual.

(Id., Ex. A.)

Additionally, the Code of Ethics outlines specific procedures for the return of electronic and hard copy documents containing NVR confidential information. Specifically,

All directors, officers and employees must, upon termination of employment with NVR, return all equipment, documents and other NVR information, including originals and copies, whether in electronic or hard copy. *Directors, officers and employees must not make or retain copies of any documents, forms, blueprints, designs, policies, memoranda or other written information developed by NVR or any affiliate of NVR now or hereafter produced and/or circulated by NVR and further agrees not to copy, transfer or otherwise retain any electronic data (including information stored on a hard drive or disk), software (including proprietary software), computer data bases or other non-print information produced, designed, owned, copyrighted or utilized by NVR.*

(Id.)

The Code of Ethics also specifies "confidential information" to include, among other things, "(a) House plans, construction manufacturing systems and

procedures manuals;  … (d) Employee salary and benefits data, medical and other personal information about employees; … (f) Cost, pricing, marketing or service strategies;  … (j) Terms of NVR's lot purchase agreements; [and] (k) Land and lot positions of profit centers."  (Id.)

The Code of Ethics further prohibits employees from, among other things, (1) disclosing confidential information to any third party, except where authorized by NVR; (2) removing confidential information from NVR's premises, or making copies of any material containing confidential information, except for legitimate NVR business; and (3) using or disclosing any NVR confidential information for personal profit, or for personal advantage or to the advantage of another person. (Id.)

In addition to the Code of Ethics, all employees are also subject to the "NVR End User Computing Policy", which dictates, among other things, NVR's policies and guidelines regarding the proper use of computing hardware, software and systems provided by the company (the "Computing Policy"). (Whitaker Decl. ¶ 7.) The Computing Policy provides, among other things, acceptable use of NVR's hardware, acceptable use and practices when accessing the Internet, and acceptable use of email.  In particular, the Computing Policy expressly provides, "You may not send any private or confidential data outside of the NVR network through e-mails."  (Id. ¶ 8, Ex. A.)

The Computing Policy further reminds NVR employees of the Code of Ethics requiring them to protect any and all "Confidential Information" and security controls implemented by NVR to protect electronically stored confidential information. Such security controls state:

> While, as part of normal business operations, "Confidential Information" is shared/distributed on a pre-arranged basis with certain third parties, you are prohibited from copying and removing "Confidential Information" from NVR offices in any format (paper, computer, disk portable storage device or email) for purposes that are not directly business-related.

(Id. ¶ 9, Ex. A.)

In addition, NVR utilizes a web-filtering solution, entitled Proofpoint, which is programmed to flag and trap emails that hit on particular sensitive key words to be subject for further review by NVR's Vice President of Internal Audit & Corporate Governance before being sent. The purpose of the web-filtering solution is to create a second check on emails with sensitive and possibly confidential information from leaving NVR without authorization. (Id. ¶ 10.)

NVR also protects its confidential files by restricting access to its sensitive materials to only those employees that have express permission. Specifically, access to highly sensitive materials, such as the Land Files, is limited to only those individuals with specific permission to view the files. (Id. ¶ 11.)

8

## III.   DAVERN'S EMPLOYMENT WITH NVR

Davern commenced his employment with NVR over ten and a half years ago as a Project Supervisor. (Sinclair Decl. ¶ 17.) Over the years, Davern has been promoted to higher level positions within NVR and beginning in May 2015 was a Sales Manager in the New Jersey South Division, overseeing approximately half of the 20-24 Sales and Marketing Representatives assigned to that Division and operating out of the model homes in the developments under construction. The New Jersey Central Division covers half of Burlington County and north, while the New Jersey South Division covers the other half of Burlington County and south. (Id. ¶ 19.)

In consideration for his employment with NVR and access to NVR's confidential and trade secret information, on January 4, 2005, Davern executed a Human Resources Policies and Procedures Acknowledgement (the "Acknowledgement"), by which Davern agreed to comply with all Human Resources Policies and Procedures, including NVR's Code of Ethics. (Id. ¶ 18, Ex. B.)

As a Sales Manager, Davern had access to highly confidential materials, such as the Land Files and files having to do with compensation of NVR employees. (Id. ¶ 20.) Davern was also a highly compensated employee during the last few years of his tenure at NVR, having earned in excess of $200,000 in

9

2014. Davern was on pace to exceed that amount of compensation this year before his abrupt resignation from NVR.  (Id. ¶ 21.)

## IV.   DAVERN'S RESIGNATION FROM NVR

While working as a Sales Manager in New Jersey South, Davern reported directly to the Division Manager, Dylan Sinclair ("Sinclair").  (Id. ¶ 19.)  On June 15, 2015, approximately 30 days into working in his new position in New Jersey South, Davern met with Sinclair to tender his resignation.   Davern provided Sinclair with a resignation letter and informed Sinclair that he was leaving the employ of NVR to work at another homebuilding company. (Id. ¶ 23, Ex. C.)

At first, Davern informed Sinclair that his resignation was premised upon a better employment opportunity with greater responsibility and better pay at this new company.  (Id. ¶ 24.)  As Sinclair attempted to explore the reasons for his decision to leave NVR, Davern eventually explained his dissatisfaction with NVR. Specifically, Davern informed Sinclair that he felt slighted by NVR over the years, including (1) having to hold the title of "Sales Manager In Training" while others hired along with him were not designated as "in training"; (2) being turned down for promotions because his superiors questioned his "judgment" and "decision-making"; and (3) transitioning from sales manager for New Jersey Central to New Jersey South took longer than he anticipated and he felt misled at points during the transition.  (Id. ¶ 26.)  At this meeting, Davern offered to continue working for

NVR for another two weeks before leaving for his new position, but once Davern confirmed that his decision to resign was final, Sinclair informed him that he should not return to work.  (Id. ¶ 27.)

A conversation between Davern and Todd Pallo ("Pallo"), NVR's Division Manager for its New Jersey Central Division, subsequently revealed that Davern left his position with NVR to join Horton – one of its largest competitors in a role similar to the Division Manager role with NVR, overseeing a significant region of New Jersey, competitive with the New Jersey South and Central Divisions. (Declaration of Todd Pallo ("Pallo Decl.") ¶ 3.)  Davern disclosed to Pallo that he had been in talks with Horton regarding such a position since the third week of May 2015.  (Id.)  Horton maintains an office located in Mount Laurel, New Jersey. (Sinclair Decl. ¶ 24.)

## V.   DAVERN'S THEFT OF NVR'S CONFIDENTIAL INFORMATION

On June 11, 2015, the NVR IT Department notified NVR's Vice President of Internal Audit & Corporate Governance that email monitoring reporting indicated that Davern was sending an unusually high volume of emails outside the company from his NVR email account.  Subsequent to Davern's resignation on June 15, 2015, NVR's Vice President of Internal Audit & Corporate Governance directed the NVR IT Department to review Davern's NVR email account activity and to acquire and inspect Davern's NVR issued computer.  (Whitaker Decl. ¶ 13.)

11

Upon these inspections, the IT Department uncovered that in the days leading up to Davern's resignation, from at least June 10, 2015 through June 15, 2015, Davern used his NVR email address, jodavern@nvrinc.com, to forward to his personal email address, jon.davern@comcast.net, more than 50 emails and attachments containing highly sensitive confidential and proprietary information regarding lot costs, developer information, timing estimates, NVR bids on various projects, costs to build homes, profit percentages and all data that is essential in NVR's analysis of a land development project and putting together bids for a land deal (i.e., Land Files) as well as information regarding compensation of NVR employees, all of which constitute NVR's confidential information. (Id. ¶ 14.)  On Friday, June 12, 2015, one of the last emails that Davern forwarded to his personal email account, attached a "2015 Sales Comp Worksheet," which appears to be NVR's proprietary sales compensation calculation document containing highly sensitive and confidential information regarding the compensation of NVR's sales representatives.  (Id. ¶ 16.) In addition, the IT Department determined that all emails in Davern's NVR email account from the previous 30 days and all files on Davern's NVR issued computer, with the exception of his resignation letter, had been deleted.  (Id.¶ 14.)

All of the foregoing information taken by Davern falls within the meaning of "Confidential Information," as defined in the Code of Ethics and Computing

Policy.  Given Davern's imminent resignation on Monday, June 15, 2015, there was no legitimate purpose for Davern to have spent at least his last three days of employment at NVR forwarding confidential information to his personal email account.  Davern was clearly aware that his actions were wrong.  Indeed, NVR's investigation also revealed that he made deliberate efforts to conceal his misconduct by attempting to remove traces of his improper activities from his NVR email account and NVR issued laptop computer prior to returning it to NVR. (Id. ¶ 14; Sinclair Decl. ¶ 33.)

Once Davern's misappropriation of confidential information came to light, it became apparent that a prior incident regarding certain missing files on NVR's servers was, upon information and belief, the result of Davern's improper actions as well.  Specifically, on or about Monday, June 1, 2015, two weeks prior to Davern's resignation, NVR discovered that the "Land Opportunities\Signed Contracts" server folder related to 2015 land contracts and the files contained within it, had been deleted.  (Whitaker Decl. ¶ 17.)  The NVR IT team was able to restore the data that went missing from a back-up copy and determined that the server folder "Land Opportunities\Signed Contracts" contained files specifically related to signed land contract documentation for the period 2011 – 2015.  (Id. ¶ 18.)  Such data included highly sensitive confidential and proprietary information, including Land Files regarding lot costs, developer information, timing estimates,

13

NVR bids on various projects, costs to build homes, profit percentages and all data that is essential in NVR's analysis of a land development project and putting together bids for a land deal.  (Sinclair Decl. ¶ 36.)

Upon information and belief, Davern misappropriated the foregoing confidential information for the purpose of exploiting it for his own personal gain. Indeed, during the time Davern transmitted the confidential information to his personal email accounts just days prior to his resignation, Davern likely had already received an offer of employment with Horton, and certainly had already met with Horton, given that it generally takes weeks if not longer for a company to hire an experienced senior sales manager or division manager in this industry.   As noted above, Davern specifically disclosed to Pallo that he had been in contact with Horton regarding a potential job offer since the third week of May 2015, weeks prior to his misappropriation.    (Pallo Decl. ¶ 3.)    The confidential information that Davern misappropriated, if disclosed to competitors, could destroy NVR's competitive advantage on any current and future sales project by uncovering the mechanisms and analysis NVR uses in order to break down the cost structure of a project and determine the terms of a deal to make it most cost effective and profitable for NVR.   A competitor with this confidential information could use it to steal land opportunities or consistently under-bid NVR, thus destroying its competitive advantage.  (Sinclair Decl. ¶ 39.)

Upon learning of Davern's theft of the confidential information, on June 19, 2015, NVR sent to Davern a cease and desist letter demanding that Davern immediately cease and desist from accessing, using and/or disclosing any of NVR's confidential, proprietary and/or trade secret information and to turn over to NVR such confidential information.   (Compl. ¶ 61.)   Davern immediately contacted the NVR's outside counsel and admitted to transmitting NVR confidential information to his personal email accounts but denied using or disclosing any such information. (Id. ¶ 62.)

To date, NVR has expended considerable efforts and devoted substantial resources in its investigation of Davern's improper use of NVR's network, the recently discovered data breach, and the recovery of any lost or misappropriated data as a result of Davern's conduct.   NVR has also retained a third-party investigator to inspect and image Davern's computer and all other electronic devices to which he has access in order to assess the full extent of Davern's misappropriation and to protect NVR from harm to its business. (Id. ¶ 63.)

## ARGUMENT

## I.   EMERGENCY INJUNCTIVE RELIEF IS NECESSARY TO MAINTAIN THE STATUS QUO.

One of the goals of an emergency injunction is to "maintain the status quo, defined as the last, peaceable, noncontested status of the parties." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting Opticians Ass'n of Am.

v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990)).  Here, NVR seeks

to protect the status quo of its customer relationships and the confidential and/or

proprietary information to which Davern was privy.

A TRO is appropriate if: (1) the plaintiff is likely to succeed on the merits;

(2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction

will not result in irreparable harm to the defendant; and (4) granting the injunction

is in the public interest.  See National Reprographics, Inc. v. Strom, 621 F. Supp.

2d 204, 222 (D.N.J. 2009) (granting a preliminary injunction and enforcing the

non-compete provisions in a former employee's contract where he was privy to

confidential and sensitive information regarding his previous employer).   As

demonstrated below, the evidence is overwhelming that: (1) NVR is likely to

succeed on the merits of its claims; (2) if injunctive relief is denied, NVR will

suffer irreparable harm; (3) granting the injunction will not result in any harm to

Defendant; and (4) it is in the public interest that Defendant is enjoined.

## II.    NVR IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

A  party  seeking  injunctive  relief  must  demonstrate  a  "likelihood  that

plaintiff will prevail on the merits at final hearing."  Pappan Enters., Inc. v.

Hardee's Food Sys., Inc., 143 F.3d 800, 803 (3d Cir. 1998).  In evaluating whether

a movant has satisfied this standard, "[i]t is not necessary that the moving party's

right to a final decision after trial be wholly without doubt; rather, the burden is on

the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." Nat'l Reprographics, Inc., 621 F. Supp. 2d at 222 (quoting Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975)). Here, NVR is likely to succeed on its misappropriation claim, its computer fraud claim, its breach of contract claims, its breach of fiduciary duty claim and its unfair competition claim.

A.    **NVR Is Likely To Succeed On Its Misappropriation Claim.**

The New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, et seq. (the "Act"), codifies an employer's common law right to assert claims for misappropriation or threatened misappropriation of trade secrets, and to seek injunctive relief in connection therewith. See Richards Mfg. Co. v. Thomas & Betts Corp., 2005 WL 2373413, at *3 (D.N.J. Sept. 25, 2005.) ("New Jersey law recognizes employers' right to protect themselves contractually from the misappropriation of trade secrets and other confidential information.").

The Act defines "trade secret" as any information, including a "formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, inventor, plan, procedure, prototype or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts

that are reasonable under the circumstances to maintain its secrecy." N.J.S.A. 56:15-2. The Act defines "misappropriation" as (1) the acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) disclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who (a) used improper means to acquire knowledge of the trade secret; or (b) at the time of disclosure or use, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means." N.J.S.A. 56:15-1. The Act further expressly states that "A person who misappropriates a trade secret shall not use as a defense to the misappropriation that proper means to acquire the trade secret existed at the time of misappropriation." N.J.S.A. 56:15-5. See also Expediters Int'l of Wash., Inc. v. Direct Line Cargo Mgmt. Servs., Inc., 995 F. Supp. 468, 481 (D.N.J. 1988) (a person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret if the circumstances justify the conclusions that the person "knew or had reason to know that the disclosure was intended to be in confidence, and … the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality.")

Furthermore, it is well-settled that "information need not rise to the level of a trade secret to be protected," (Lamorte Burns & Co., Inc. v. Walters, 167 N.J.

285, 299 (2001)), and, depending on the circumstances of the alleged misuse, may even be otherwise publicly available. Platinum Mgmt., Inc. v. Dahms, 285 N.J. Super. 274, 295 (1995). "The key to determining the misuse of information is the relationship of the parties at the time of disclosure, and its intended use." Id. Indeed, "specific information provided to defendants by their employer, in the course of employment, and for the sole purpose of servicing plaintiff's customers, is legally protectable as confidential and proprietary information." Lamorte, 167 N.J. at 301.

As set forth above and in the accompanying Sinclair and Whitaker Declarations, NVR has an interest in protecting various types of information as trade secrets, confidential and proprietary information. Its confidential and trade secret information is integral to NVR's efforts at maintaining a commercial advantage and analyzing and closing new land deals. Such information is not publicly available and cannot be independently replicated unless one were to invest substantial time, expense and effort as NVR has over many years. (Sinclair Decl. ¶¶ 12-16; Whitaker Decl. ¶¶ 4-11.) The Act clearly provides that in cases involving actual or threatened misappropriation, as is the case here, an injunction may be an appropriate remedy. N.J.S.A. 56:15-3.

NVR has taken many efforts to keep this information confidential. Specifically, (1) all employees are required to abide by the terms of the Computing

Policy which directs employees on how to maintain NVR equipment and information to protect against its disclosure; (2) NVR utilizes a web-filtering solution designed to flag and trap emails that hit on particularly sensitive key words to be subject to a second level review before being released to individuals outside NVR; and (3) all highly confidential files, including Land Files, are only accessible to employees with express permission. (Whitaker Decl. ¶¶ 4-11). In addition to such above-referenced efforts to protect against unintended or improper disclosure of NVR's information evidencing that NVR considers such information to be confidential and proprietary, is the fact that Davern was required to sign an acknowledgement that he would abide by the Code of Ethics, which specifically includes non-disclosure provisions.   (Sinclair Decl. ¶ 12-16, Ex. A.)   <u>See</u> <u>Latuszewski v. Valic Fin. Advisors, Inc.</u>, 2007 WL 4462739 at *17 (W.D. Pa. Dec. 19, 2007) ("The presence of non-disclosure covenants in [] employment contracts is further evidence of the confidential nature of the information.").

On these facts, which Davern cannot reasonably dispute, NVR is likely to succeed on the merits of its misappropriation claim.

## B.   <u>NVR Is Likely To Succeed On the Merits Of Its Breach Of Contract Claims.</u>

NVR adequately alleges and will likely succeed on its two separate claims of breach of contract against Davern. First, NVR seeks enforcement of Davern's confidentiality obligations to NVR as set forth in the Code of Ethics. Second,

NVR seeks the return of property and confidential information within Davern's possession and control.

Under New Jersey law, to establish a breach of contract claim, a plaintiff must show: (1) the existence of a valid contract; (2) breach of that contract; (3) damages flowing therefrom; and (4) that plaintiff performed its own contractual duties. Nat'l Reprographics, 621 F. Supp. 2d at 222. Here, Davern is bound to the Code of Ethics as evidenced by his executed Acknowledgement, dated January 4, 2005, agreeing as such (Sinclair Decl., Ex. B). NVR complied fully with its end of the bargain by providing him with continued employment and access to NVR's confidential and trade secret information.

> (1)   Davern's Breach of The Confidentiality Obligations In NVR's Code of Ethics.

The restrictions and confidentiality obligations set forth in the Code of Ethics are designed to prevent the unauthorized use or dissemination of NVR's confidential information and trade secrets. See Nat'l Reprographics, 621 F. Supp. 2d at 226 (an employer's proprietary and confidential information, as well as its relationships with its customers, are legitimately protectable interests). Protection and preservation of confidential and/or trade secret information is a legitimate business interest justifying a restrictive employment covenant. See id. ("Employers have a right to contractually protect their confidential information."). It is a well-settled principle that employees who have been entrusted with

21

confidential information pertaining to the conduct of their employer's business may not subsequently use that information to further their own ends. See Lamorte, 167 N.J. at 300 ("an agent must not take 'unfair advantage of his position in the use of information or things acquired by him because of his position as agent'") (citing Restatement (Second) of Agency § 395 (1958) ("[u]nless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency in violation of his duties as agent, in competition with or to the injury of the principal.")

Davern brazenly breached his agreement not to disclose or misuse NVR's confidential information when he forwarded to his personal email address highly confidential and proprietary information belonging to NVR for no legitimate business purpose and knowing that he would resign from NVR soon thereafter. There is simply no reason Davern would do so but for his intent to use the confidential information for an unauthorized purpose, or to divulge it to a third party competitor of NVR, all in violation of the Code of Ethics. Accordingly, NVR is likely to succeed on its claim that Davern breached the Code of Ethics.

     (2)   Davern's Failure To Return Confidential Information And NVR Property.

NVR is also likely to succeed on its claim that Davern breached the Code of Ethics by failing to return NVR's property, including any NVR information,

whether confidential or proprietary, that may still reside on his home computer or any other electronic device in his possession or control. Specifically, the Code of Ethics requires that upon termination of employment with NVR, all employees "must not make or retain copies of any documents ... and further agrees not to copy, transfer or otherwise retain any electronic data ... produced, designed, owned, copyrighted or utilized by NVR." (Sinclair Decl., Ex. A.)

Based upon the foregoing, NVR has established a likelihood of success on the merits of its breach of contract claim arising from Davern's failure to return NVR's confidential information.

**C.    NVR Is Likely To Succeed On Its Claims Under The Computer Fraud And Abuse Act And New Jersey's Computer Related Offenses Act.**

A violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* occurs when, among other things, any person:

> (a)    intentionally accesses a computer network without authorization and/or exceeds authorized access and thereby obtains information from any protected computer if the conduct involved an interstate or foreign communication; or

> (b)    knowingly and with intent to defraud, accesses a protected computer network without authorization, or exceeded authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, resulting in damages exceeding $5,000.00; or

> (c)    knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage; or

    (d)    intentionally accesses a protected computer network without authorization and/or exceeds authorized access, and, as a result of such conduct, recklessly causes damage exceeding $5,000.00.

18 U.S.C. § 1030, *et seq.*  The CFAA expressly provides a plaintiff with a civil cause of action against those who illegally use computers for their own advantage to plaintiff's detriment.  18 U.S.C. § 1030(g).

New Jersey's Computer Related Offenses Act ("CROA"), N.J.S.A. 2A:38A-3, is even broader.  It provides that any person or enterprise damaged in business or property as a result of certain computer related offenses "may recover compensatory and punitive damages and the cost of the suit including a reasonable attorney's fee, costs of investigation and litigation."  Such computer related offenses include:

    (a)    The purposeful or knowing, and unauthorized altering, damaging, taking or destruction of any data, data base, computer program, computer software or computer equipment existing internally or externally to a computer, computer system or computer network; …

    (c)    The purposeful or knowing, and unauthorized accessing or attempt to access any computer, computer system or computer network; … or

    (e)    The purposeful or knowing accessing and reckless altering, damaging, destroying or obtaining of any data, data base, computer, computer program, computer software, computer equipment, computer system or computer network ….

N.J.S.A. 2A:38A-3.

Unquestionably, Davern was not authorized to access any NVR network to forward confidential information to his personal email address for his own personal gain. Nor was Davern authorized by NVR to access NVR's servers for the purpose of to copying, altering, removing or deleting NVR's confidential information for his own use and gain. Indeed, upon information and belief, Davern was responsible for the loss and corruption of certain confidential data and files from NVR's servers two weeks prior to his resignation. One of these files was later determined to be a "Land Opportunities/signed Contracts" folder containing files specifically related to signed land contract documentation for the period 2011 - 2015. In addition, Davern further attempted to and did in fact partially destroy and spoliate certain email communications, files, and other confidential, proprietary and trade secret information stored electronically on his NVR email account and NVR laptop in an effort to conceal his misconduct.

Such activities were expressly and very specifically prohibited by NVR's policies, which Davern received and acknowledged. (Sinclair Decl. ¶¶ 12, 18.) There remains no cognizable legitimate business purpose for which Davern, just days before he resigned from NVR, would forward such highly sensitive information regarding old and new land deals to his personal email address. Davern's theft of NVR's confidential electronic data has caused NVR to devote

resources to investigate the extent of damage caused by Davern's misconduct, including the hiring of a third party forensic investigator.

Davern, therefore, violated both the CFAA and CROA when, in June 2015, he knowingly accessed confidential information on NVR's protected computer and network containing NVR's confidential information without NVR's permission, and wrongfully transmitted computerized files of such information, including NVR's confidential information, including the Land Files, to himself, thereby causing irreparable damage to NVR. Davern's actions caused damage to NVR by forcing NVR to expend time, effort, and money to investigate Davern's wrongful conduct. (Sinclair Decl. ¶ 37.) The CFAA expressly authorizes injunctive and other equitable relief in these circumstances, and NVR is entitled to such relief as a result of Davern's illegal actions. 18 U.S.C. § 1030(g); Civic Ctrs. Motors v. Paragon Honda, 387 F. Supp. 2d 378, 381 (S.D.N.Y. 2005) (recognizing that the CFAA defines a compensable loss as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program system or information to its condition prior to the offense, and any revenue, cost incurred or other consequential damages incurred because of the disruption of service."); Givaudan Fragrances Corp. v. Krivda, Civ. A. No. 08-4409 (PGS), 2010 WL 1644070 (D.N.J. Apr. 22, 2010) (granting preliminary injunction on consent for alleged violation of the CFAA).

26

**D.    NVR Is Likely To Succeed On Its Breach of Fiduciary Duty Claim.**

Separately, NVR is also likely to succeed on its breach of fiduciary duty claim.  "[L]oyalty from an employee to an employer consists of certain very basic and common sense obligations.  An employee must not while employed act contrary to the employer's interest.  And, during that period of employment, an employee has a duty not to compete with his or her employer." Lamorte Burns & Co., 167 N.J. at 302 (2001); see also P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, L.L.C., No 04-4554 (JAG), 2007 WL 708978, at *12 (D.N.J. Mar. 5, 2007) (noting that "certain preparatory arrangements made by employees in anticipation of future employment established by employees to compete directly with their current employer, [do] in fact constitute a breach of employees' duty of loyalty to their employer").

Here, it is evident that while Davern was still employed by NVR, he began to mass-email to his personal email account confidential information, including Land Files, with full knowledge that he was days away from tendering his resignation.  (Pallo Decl. ¶ 3; Sinclair Decl. ¶¶ 28-33; Whitaker Decl. ¶¶ 13-16). Davern also improperly accessed and removed files from NVR's servers. (Sinclair Decl. ¶¶ 34-36; Whitaker Decl. ¶¶ 17-18.)  By misappropriating such confidential information, Davern acted against NVR's interest in keeping such information protected and secure within NVR.  NVR takes extra steps to protect and closely

guard unauthorized dissemination of its confidential and trade secret information (Whitaker Decl. ¶¶ 4-11), and by Davern's unauthorized taking of such information, NVR's interests were directly harmed, risking its competitive advantage.

**E.    NVR Is Likely To Succeed On Its Unfair Competition Claim.**

Finally, NVR is likely to succeed on its unfair competition claim.  The Supreme Court of New Jersey has stated that "the public has a clear interest in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest." Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 639 (1988).  Similarly, Hoffman-LaRoche, Inc. v. Genpharm, Inc., 50 F. Supp. 2d 367 (D.N.J. 1999) clearly instructs that misappropriation of a trade secret constitutes unfair competition under New Jersey law.  Id. at 381; see also Mailman, Ross, Toyes & Shapiro v. Edelson, 183 N.J. Super. 434, 442-43 (Ch. Div. 1982) (describing the use of confidential information and trade secrets as forms of unfair competition); cf. Schmidinger v. Welsh, 243 F. Supp. 852, 864 (D.N.J. 1965), rev'd on other grounds, 383 F.3d 455 (3d Cir. 1967) (describing the misappropriation of trade secrets and confidential information as unfair competition).

Thus, under settled New Jersey law, by misappropriating NVR's trade secrets and confidential and proprietary information, Defendant has engaged in unfair competition.

## III.   NVR WILL CONTINUE TO SUFFER IRREPARABLE HARM IF THIS COURT DOES NOT GRANT INJUNCTIVE RELIEF.

Davern's conduct to date has caused and threatens to cause significant and irreparable harm to NVR.  A preliminary injunction is appropriate where, as here, a plaintiff is threatened with potential harm "which cannot be redressed by a legal or equitable remedy following a trial." Nat'l Reprographics, 621 F. Supp. 2d at 229.

It is well-settled that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." Pappan Enters., 143 F.3d at 805. Irreparable injury may be established "where there is danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Americas, 74 A.D.3d 696, 697, 904 N.Y.S.2d 46, 47 (1st Dep't 2010) (citing Faively Trans. Malmo AB v. Wabtc Corp., 559 F.3d 110, 118 (2d Cir. 2009)), Nat'l Starch & Chem. Corp. v. Parker Chem. Corp., 219 N.J. Super. 158, 163 (App. Div. 1987) (injunction warranted where employee signed an agreement stating she understood that "the misuse or disclosure of [trade secrets] would irreparably damage the company")).

NVR's loss of its trade secrets and confidential information cannot be measured in money damages because the disclosure of its trade secrets to a third party, including a competitor such as Horton, would put NVR "at a competitive disadvantage that a legal remedy could not redress." Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 118 (3d Cir. 2010); Neo Gen Screening, Inc. v. Telechem International, Inc., 69 Fed. Appx. 550, 554-55 (3d Cir. 2003) ("[t]he disclosure of trade secrets would result in irreparable harm"); see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) (holding that loss of trade secrets was an irreparable harm that could not be measured in money because "a trade secret once lost is, of course, lost forever").

In the matter at hand, if Davern is not enjoined, and is instead able to retain NVR's confidential information, particularly while under a competitor's employ, and continue his breach of the Code of Ethics, NVR faces significant and irreparable harm. It is exceedingly difficult, if not impossible, to predict NVR's loss if Davern is permitted to exploit such information. If Davern is allowed to proceed with his unlawful misconduct, the result for him, however, is clear: Davern and/or any competitor of Davern, who obtains the confidential information may succeed in undermining NVR's business and goodwill, causing substantial irreparable and incalculable harm.

30

Indeed, given that the confidential information misappropriated by Davern includes highly sensitive information regarding every facet of NVR's analysis of a land opportunity including how it evaluates the costs and profitability of a land deal, as well as its bids, timeline and developer contacts, Davern and/or a competitor of NVR armed with this information can single-handedly undercut and circumvent NVR's strategies and tactics in closing a land deal in order to steal the business away.  (Sinclair Decl. ¶¶ 29, 36; Whitaker Decl. ¶¶ 14-15.)  Therefore, only an immediate injunction enjoining Davern from misusing, disclosing or exploiting NVR's confidential information, including the Land Files, will ensure that he will not cause any more irreparable damage to NVR's business. For these reasons, a finding of irreparable harm and an emergency injunction is appropriate.

## IV.   DEFENDANT WILL SUFFER NO HARM IF THE INJUNCTION IS GRANTED.

While NVR faces irreparable harm unless this Court issues the requested injunction, on the other hand, Davern will not be harmed whatsoever by the issuance of an injunction.  In terms of the contractual provisions, NVR is merely seeking enforcement of the Code of Ethics' non-disclosure provisions.  Defendant certainly has no legitimate interest in misusing NVR's confidential information. Given that Davern is not entitled to retain any NVR confidential information, including the Land Files to begin with, there is no harm to Davern by entering such an injunction against him, and an order requiring him to return such information.

## V.   ENFORCEMENT OF DAVERN'S OBLIGATIONS TO NVR IS NECESSARY TO PROTECT AND FURTHER THE PUBLIC INTEREST.

Enforcement of the Code of Ethics and Davern's legal obligations to NVR does not adversely impact the public interest.  Indeed, "enforcing reasonable terms of an employment agreement is within the public interest."  Nat'l Reprographics, 621 F. Supp. 2d at 230.  Furthermore, by enacting the New Jersey Trades Secret Act, the Legislature spoke to the importance of protecting business from unfair exploitation or threatened misappropriation of trade secrets, and provides for injunctive relief as an appropriate remedy.  N.J.S.A. 56:15-3 ("Actual or threatened misappropriation may be enjoined.").

The public interest has been defined as the "clear interest in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest."  Id. at 229 (citing Ingersoll-Rand, 110 N.J. at 638-639).  The obligations and restrictions in the Code of Ethics merely seek to protect the integrity of NVR's confidential information -- a goal which promotes, rather than frustrates, prudent commercial practices and a competitive business environment.  See ACE Am. Ins. Co. v. Wachovia Ins. Agency, Inc., 2008 WL 4630486 (D.N.J. Oct. 17, 2008).  As such, enforcement of the Code of Ethics will not visit any harm to the public interest.

Conversely, Davern's ongoing intent to misuse or threatened misuse of NVR's confidential information serves absolutely no public interest. Enforcement of the Code of Ethics will not only protect NVR's goodwill and confidential information, but it will also remedy Defendant's unscrupulous actions and discourage anti-competitive conduct in the future.

## VI. NVR IS ENTITLED TO EXPEDITED DISCOVERY AND A PRESERVATION ORDER.

In order to present the facts of this case to the Court as completely as possible for purposes of presenting NVR's Motion for Preliminary Injunction, and to discover the full extent of Defendant's unlawful activities and the corresponding damage being done or already done to NVR, it must conduct certain limited, expedited discovery.

Specifically, in advance of a preliminary injunction hearing, NVR should be permitted to serve limited, narrowly focused interrogatories, requests for production of documents, and deposition notices to elicit highly relevant facts, including, by way of example: (1) determine the whereabouts of all NVR confidential information in Davern's possession or control; (2) the nature and extent of any and all unauthorized use or disclosure of NVR's confidential, proprietary and/or trade secret information; and (3) Davern's pre- and post-resignation conduct, including the extent and nature of communications between Davern and Horton.

Rule 26(d) of the Federal Rules of Civil Procedure authorizes this Court to enter an Order permitting expedited discovery, and expedited discovery is appropriate in connection with preliminary injunction motions seeking to prevent irreparable injury.  See Ellsworth Assocs., Inc. v. United States, 917 F. Supp. 841, 844 (D. D.C. 1996) ("Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings"); Commodity Futures Trading Commission v. Krysinski, No. 03-C-8571, 2003 WL 23195535, **1-2 (N.D. Ill. Dec. 1, 2003) (finding expedited discovery appropriate "because of the emergency nature of the situation" where plaintiff sought an *ex parte* statutory restraining order and preliminary injunction); Edudata Corp. v. Scientific Computers, Inc., 599 F. Supp. 1084, 1088 (D. Minn. 1984) (expedited discovery would "better enable the court to judge the parties' interests and respective chances for success on the merits" at a preliminary injunction hearing); Advisory Committee Notes to FED. R. CIV. P. 26(d) ("Discovery can begin earlier . . . in some cases, such as those involving requests for a preliminary injunction").

Moreover, this Court has found expedited discovery appropriate in cases seeking injunctive relief, and specifically in cases seeking to enjoin unfair competition.  See, e.g., Graco, Inc. v. PMC Global, Inc., No. 08-1304, 2011 WL 2868930 (D.N.J. Feb. 14, 2011) (allowing expedited discovery on plaintiff's claim

for misappropriation of trade secrets); <u>Givaudan Fragrances</u>, 2010 WL 1644070 (allowing expedited discovery in a case involving claims of misappropriation of trade secrets and breach of a restrictive covenant). "Leave to conduct expedited discovery . . . is governed by the reasonableness standard." <u>Better Packages, Inc.</u> <u>v. Zheng</u>, No. 05-4477, 2006 WL 1373055, at *4 (D.N.J. May 17, 2006). Under this standard, the Court "should examine the appropriateness of a request for expedited discovery by weighing the need for the discovery at that point in the litigation with the breadth of the discovery requests." <u>Id.</u> at *3.

Here, NVR's request to conduct expedited discovery is eminently reasonable. The need for discovery is great; to be sure, if NVR has to wait to take discovery in the normal course, it will be forced to present its case at a hearing on its Motion for Preliminary Injunction on an incomplete record, and it will suffer irreparable injury while discovery proceeds in the ordinary course. The expedited discovery NVR seeks is limited in scope and narrowly tailored to the issues underlying NVR's claims for preliminary injunctive relief. Moreover, by allowing expedited discovery, the Court will be in a better position to consider NVR's Motion for Preliminary Injunction and to prevent further damage to NVR.

NVR, therefore, respectfully requests that this Court enter an Order allowing the taking of Davern's depositions on five (5) calendar days' notice, and requiring Defendant to produce requested documents and respond to interrogatories within

seven (7) calendar days from the date of receipt thereof.  NVR is fully prepared to issue discovery upon entry of an Order granting this Motion.

In addition, in order to allow the Court to effectively and completely evaluate the evidence relevant to this matter, NVR also seeks an Order requiring the parties to preserve all evidence relevant to the facts and circumstances alleged in NVR's Complaint.  This includes, but is not limited to, hard copy or electronic files of documents, computer files, hard drive data, ambient data, electronic mail messages, instant messages, contracts, invoices, files, correspondence, text messages, voicemail messages and phone logs in Defendant's custody or control or otherwise available to Defendant concerning or relevant to the issues set forth in NVR's Complaint and Motion for Preliminary Injunction.  Such an Order will ensure that the Court has all necessary information available to it as it considers NVR's claims and the damage that NVR has suffered and continues to suffer as a result of Defendant's unlawful acts.

## CONCLUSION

For all the reasons set forth above, NVR respectfully requests that this Court issue an order granting NVR a temporary restraining order and preliminary injunction against Defendant. NVR further respectfully requests that this Court enter an Order granting the expedited discovery in aid of the preliminary injunction hearing, and that all evidence relevant to the facts and circumstances alleged in the Complaint and present motion be preserved by the parties.

Dated:  New York, New York
        July 2, 2015

                    SEYFARTH SHAW LLP


                    By:_____
                    James S. Yu
                    620 Eighth Avenue
                    New York, New York  10018-1405
                    Tel: (212) 218-5500

                    Barry J. Miller, Esq.
                    (*Pro Hac Vice* Motion To Be Filed)
                    SEYFARTH SHAW LLP
                    2 Seaport Lane, #300
                    Boston, MA 02210
                    Tel:  (617) 737-1900

                    *Attorneys for Plaintiff*
                    *NVR, Inc.*

37