IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____ :
                                :
NVR, INC.,                      :   CIVIL ACTION
                                :
             Plaintiff,         :   No. 1:15-cv-05059-NLH-KMW
                                :
      v.                        :   *Jury Trial Demanded*
                                :
JONATHAN DAVERN,                :
                                :
             Defendant.         :
_____ :

## DEFENDANT JONATHAN DAVERN'S COUNTERCLAIMS AGAINST PLAINTIFF NVR, INC.

Pursuant to this Court's Order dated November 29, 2016 (doc. no. 222), granting Defendant/Counterclaim Plaintiff Jonathan Davern leave to file his counterclaims, *nunc pro tunc* to the date of their original filings or February 5, 2016, Davern hereby asserts his counterclaims against Plaintiff/Counterclaim Defendant NVR, Inc. ("NVR") as follows:

1.      Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Davern's claims over NVR set forth in these counterclaims.

### Factual Background

2.      Davern began his employment with NVR on January 3, 2005.

3.      On January 4, 2005, Davern executed an Acknowledgement that he had received and reviewed specified Human Resources Policies of NVR, including

the 2004 NVR Code of Ethics.  The 2004 NVR Code of Ethics does not contain a provision entitled or concerning "Confidential, Proprietary and Inside Information."

4.      The original Complaint filed by NVR in this lawsuit falsely represented that Davern on January 4, 2005 executed an Acknowledgement that he had received and reviewed policies including the Code of Ethics that contained a provision entitled "Confidential, Proprietary and Inside Information."  During the deposition of the corporate designee of NVR on November 18, 2015, Davern established that such averments were false, as were the averments of paragraph 23 of the Complaint to the effect that Exhibit A of the Complaint is an excerpt from the Code of Ethics.  Davern requested at the November 18, 2015 deposition that NVR amend the Complaint to correct these factual errors.

5.      The Acknowledgement signed by Davern after he began his employment expressly disclaims that it constitutes a contract or a confidentiality agreement between Davern and NVR.  Specifically, the Acknowledgement executed by Davern on January 4, 2005 states that "the Human Resources Policies and Procedures do not constitute nor shall they be relied on as constituting an employment contract between NVR and any of its employees."

6.      During the corporate designee deposition of NVR on November 18, 2015, NVR's designee, James Sack, who is the General Counsel of NVR, admitted

2

on behalf of NVR that the Code of Ethics is not a contract between the company and the employee.  Despite this admission, the Amended Complaint continues to allege two counts for breach of contract based on Davern's alleged failure to comply with provisions of the Code of Ethics.

I.   **NVR's failure to take reasonable measures to safeguard information it considers to be confidential, proprietary or trade secret.**

7.   On December 17, 2003, the NVR Board of Directors adopted the NVR Standards of Business Conduct, which became effective January 1, 2004 (the "2004 Standards of Business Conduct."  This 21 page, single spaced policy contained a provision entitled "Confidential, Proprietary and Inside Information." Although the Board of Directors expressly required that "[a]ll new employees are required to sign a form acknowledging that they have received, read and agree to comply with" the 2004 Standards of Business Conduct, NVR management ignored this requirement and did nothing for over a year to implement the 2004 Standards of Business Conduct.

8.   Consequently, Davern was not provided a copy of the 2004 Standards of Business Conduct when he signed the Acknowledgement on January 4, 2005, or at any other time in 2005.

9.   Between 2005 and 2015, NVR did not have a policy or practice of providing new employees with training or orientation to inform and educate new employees on (i) the purpose, contents, or meaning of the policies that were the

3

subject of the Acknowledgement signed by new employees or (ii) what NVR considers to be confidential, proprietary, or trade secret information.

10.     Between 2005 and 2015, NVR did not at any time provide education or training to employees generally on the practices it expects employees to follow with respect to handling or sharing with others information it considers to be confidential, proprietary, or trade secret information.

11.     On January 2, 2008, NVR changed the Code of Ethics to add a provision entitled "Confidential, Proprietary and Inside Information."

12.     At the time that NVR added the Confidential Information provision to the Code of Ethics in January 2008, no special training or education was provided to NVR employees about this new provision.

13.     Although the provision entitled "Confidential, Proprietary and Inside Information" set forth in the 2004 Standards of Business Conduct and a similar provision set forth in the 2008 Code of Conduct refer to "trade secret" information, the term "trade secret" is not defined in either such provision nor are examples of information considered by NVR to be "trade secret" set forth in either such provision.

14.     At no time between 2005 and 2015 did NVR provide any training or education to its employees regarding the meaning, importance or practical

requirements of the provisions concerning "Confidential, Proprietary and Inside Information," including the definition and meaning of "trade secrets."

15.    The "Confidential, Proprietary and Inside Information" policy set forth in the Code of Ethics and the Standards of Business Conduct does not require that documents deemed by NVR to constitute confidential, proprietary or trade secret information be clearly marked "Confidential" or "Trade Secret" to protect its status and prevent disclosure to third parties.

16.    During the Preliminary Injunction hearing on December 15, 2015, NVR's counsel falsely represented to the Court that one of the managerial responsibilities of Davern, as a Sales Manager, was to enforce the provisions concerning "Confidential, Proprietary and Inside Information."  No such job responsibility is contained in the position description for the Sales Manager, a copy of which is attached hereto as Exhibit 1. [NVR000001-000005].  To the contrary, the Senior Vice President of Human Resources, is designated in the Code of Ethics and Standards of Business Conduct as having the managerial responsibility to enforce compliance with these policies.

17.    The NVR End User Computing Policy was established by NVR on March 7, 2008 for the purpose of providing policies and guidelines for "the proper use of computing hardware, software and systems provided by the company."

18. At the time NVR established the End User Computing Policy, which is a thirteen page, single-spaced document, NVR did not provide any training to employees about the new policy.

19. The End User Computing Policy authorizes employees to access NVR Information using personally owned computing devices such as smartphones and personal computers.

20. A true and accurate copy of the End User Computing Policy in effect in January 2015, which remains in effect today, is attached to the First Amended Complaint as Exhibit C.

21. The NVR IT End User Computing Policy does not require that documents containing Confidential Information be marked "Confidential."

22. Even though the End User Policy prohibits using personally owned computing devices to connect to the NVR network, NVR's security measures do not include any means to detect or prevent such unauthorized access to the NVR Network.

23. NVR has adopted a policy entitled NVR Mobile Telecommunications and Computing Policy for the purpose of providing policies and guidelines concerning mobile telecommunications and mobile computing services and devices.

24.     The NVR Mobile Telecommunications and Computing Policy authorizes numerous categories of employees to use personal mobile computing devices to perform job responsibilities and reimburses employees for the cost of using such devices.  Davern was authorized to use his personal smartphone and was reimbursed for the monthly cost of such device.

25.     NVR's IT End User Computing Policy and Mobile Telecommunications Policy permit employees to use their personal computing devices, such as smart phones and tablets, to conduct business and perform work on behalf of NVR.  Specifically, these policies do not proscribe moving information NVR considers to be confidential, proprietary or trade secret information to such devices.

26.     NVR has high attrition rates.  Each year, 500-600 employees cease to be employees of NVR, representing 12-15% of all full time employees of NVR.

27.     NVR does nothing to retrieve confidential, proprietary, or trade secret information residing on the personal computing devices of departing employees.

28.     NVR does not do exit interviews with departing employees to remind them they should return any NVR information in their possession.

29.     NVR does not require departing employees to sign any paperwork in connection to ceasing employment to represent to NVR that the departing employee has or will return any NVR information in their possession.

30.     NVR does not send a letter to employees leaving the company, (i) reminding them that they must not disclose or use any information of NVR considered to be confidential, proprietary or trade secret, or (ii) requesting that they return any information of NVR in their possession.

31.     NVR does not have a policy requiring that confidential documents be stamped "confidential."

32.     NVR's Chief Information Officer has adopted an e-mail retention policy, a copy of which is attached as Exhibit 2 [NVR004673].  The e-mail retention policy expressly authorizes end users to "hard delete" emails by emptying their "Deleted Items" folder in Microsoft Outlook.  End users are authorized to save local copies of their emails "indefinitely" but are informed that Plaintiff will remove e-mails from its centralized e-mail servers within 28 days.

33.     Although Division Managers are responsible for protecting information considered by NVR to be confidential, proprietary or trade secret, Davern's Division President Dylan Sinclair did not request that departing employees return any NVR information in their possession.

34.     NVR does not in any meaningful sense limit access to information residing in NVR servers containing what it considers to be trade secret or confidential information.  For example, although NVR contends that what it refers

8

to as its "Land Files" constitute trade secret information, *every* employee of the division in which Davern worked was given access to the Land Files.

35.    NVR uses a proofing software application, which according to NVR's Chief Information Officer David Whitaker, is intended to protect NVR from outside spammers and malware email senders.

36.    NVR's motion for Preliminary Injunction and accompanying Declaration of David Whitaker incorrectly represent that such proofing software is a security measure used by NVR to "flag and trap emails . . . with sensitive and possibly confidential information from leaving NVR without authorization." Doc. No. 4-1 at p. 14 of 43.  During the corporate designee deposition of NVR, Whitaker admitted that his declaration was drafted by counsel and that in fact the proofing software does not have the ability to trap or intercept emails employees send to personal email accounts.

37.    NVR knows that its security measures to safeguard information considered to be confidential, proprietary, or trade secret do not in fact

     (a)    prevent employees from moving such information from NVR
            servers to personal smart phones and other computing devices;

     (b)    prevent accessing NVR servers using personal smart phones
            and other computing devices;

       (c)     identify or track when such information is moved outside NVR

servers, or

       (d)     identify any person who deletes such information from NVR

servers.

38.    NVR maintains hard copies of its Land Files in unlocked file cabinets in its Division offices and has no way to know who may remove such information from its file cabinets.

39.    NVR has a telephone directory which it periodically updates and disseminates to all its employees and to other persons outside the company.

40.    There is nothing in the NVR telephone directory indicating that it is confidential.

## II.    Davern's Resignation from NVR

41.    In April 2015, Mike Sachs, an outside recruiter with The RIO Group, arranged for Davern to meet with D.R. Horton, Inc. ("Horton") about a VP of Sales role in Washington, D.C.  Over the years, the RIO Group had solicited a number of NVR employees, including Defendant's co-worker and friend Steve Sembach, to pursue job opportunities with Horton or other home builders.

42.    Horton offered the VP of Sales job in Washington, D.C. to Davern, but he turned it down.

10

43.     Thereafter, Davern told his friend and co-worker Sander Mens that he had turned down the offer of Horton for the position in Washington, D.C. and when Mens expressed an interest in the position, Davern indicated he could put Mens in touch with Mike Sachs.  Davern gave Sachs the email address Mens gave to Davern for this purpose.  Davern's sole purpose in providing the email address of Mens to Sachs was to help his friend, not to help himself or to harm NVR.

44.     NVR has no policy prohibiting employees from identifying employment opportunities to co-workers.

45.     It is common practice within the building industry for companies and recruiters to solicit employees of other home builders.  To that end, NVR routinely encourages its employees to recruit potential employees working for other home builders.

46.     On June 11, 2015, Massimo Favro, an employee in NVR Information Technology, informed Michael Kotowski, NVR's Vice President for Internal Audit and Corporate Governance, that Davern had "sent more than 270 messages (personal and work related) to his own Comcast email account" starting two days earlier, and provided Kotowski with a screen shot of such activity from the proofing software, NVR's email monitoring tool.

47.     Even though Kotowski knew that such activity did not comply with company policy, he did not contact Davern, Davern's supervisor, or the Jim

11

Repole, Senior Vice President of Human Resources and the company's Chief Ethics Officer about this discovery.

48.    Davern submitted his resignation to NVR on June 15, 2015.  After learning that Davern had accepted a position with another home builder, Davern's supervisor Dylan Sinclair, told him to go home rather than return to his office.

49.    At the time Davern left NVR on June 15, 2015, his corporate computer was in his NVR office.  Davern had hard deleted all his emails from his Microsoft Outlook folder and had deleted his files from his corporate laptop.  Although neither of these acts violated any corporate policy of Plaintiff, in this litigation Plaintiff has represented in pleadings and to the Court that such acts were wrongful.

50.    On June 15, 2015, Favro sent a further email to Kotowski indicating that based on reviewing the email traffic of Davern, someone should talk to Davern about what he copied and also to pass the information to HR if necessary.

51.    On the day Davern resigned, no one at NVR told him that he should not take or retain any confidential information of NVR.

52.    NVR requires that Managers complete a "Resignation/Termination Checklist" for departing employees ("Manager Checklist").  A copy of this form is attached hereto as Exhibit 3 [NVR004645].

53.     The Manager Checklist does not include any reference to recovering any Confidential Information that may be in the possession of the departing employee.

54.     Dylan Sinclair, the Division President of the New Jersey South Division of NVR, was Davern's manager.  Sinclair spoke with Davern late in the day on June 15, 2015 then sent an email at 6:02 p.m. to NVR Area President John Harper and others indicating that Davern's decision to resign was final.

55.     A completed Manager Checklist for Davern has not been located and produced by NVR.

56.     On June 16, 2015, Kotowski sent an email to Sinclair requesting that he review an attached spreadsheet to give him an idea of whether the Davern emails contained sensitive/confidential information.  Kotowski copied Jim Repole, Senior Vice President for Human Resources and NVR's Chief Ethics Officer and requested a call the following day with himself, Sinclair and Repole to discuss their thoughts and plan what to do going forward.

57.     Kotowski testified that he did not know why he did not ask Repole to direct Sinclair to contact Davern and request the return of NVR information in his possession.

58.     Sinclair testified that after he learned that Davern had forwarded NVR information to his personal email account, it never occurred to him to contact Davern and ask him to return the NVR information.

### III.     Davern's efforts not to use, disclose and to return NVR Information

59.     The day after leaving NVR, Davern communicated with David Vasso, a prominent land broker in New Jersey and informed him that he had left NVR to become Division President of Horton in New Jersey.  As a follow up to learning this information, Vasso solicited Davern to consider a land opportunity he was brokering to home builders.

60.     On June 17, 2015, Davern sent an email to Vasso in which Davern stated: "As much as I like to compete and go after deals, I believe it would be best for me to sit this one out.  I had knowledge that NVR was pursuing this deal and I do not feel right going after a deal that I had inside information on."  A copy of this email is attached as Exhibit 4 [D-97].

61.     On June 19, 2015, the law firm of Seyfarth Shaw sent a cease and desist letter to Davern, a copy of which is attached hereto as Exhibit 5 [D-59].

62.     Immediately upon receipt of the letter, Davern called attorney James Yu, the author of the letter, and told him Davern would do everything requested in the letter.

63.     On June 25, 2015, Davern turned over to his counsel all his digital devices, including three flash drives and various email account information for forensic inspection by Plaintiff and removal of all NVR information.

64.     Davern's counsel contacted counsel for NVR and informed him that Davern had turned over all his digital devices and flash drives to Davern's counsel for inspection by NVR and to remove any NVR information.  He also informed NVR's counsel that Davern had returned to counsel all hard copy documents in his possession.

65.     Despite the assurances and agreements from Davern and his counsel, NVR commenced this lawsuit on July 2, 2015.  Davern and his counsel agreed to enter into a consent order simultaneously with the filing of the lawsuit to provide further assurance to NVR and permit time for all information residing on Mr. Davern's digital devices to be remediated by NVR.

**IV.   NVR's Public Disclosures about Confidential Information and the Activities of its Vice President of Internal Audit and Corporate Governance related to Davern.**

66.     Kotowski has been NVR's Vice President of Internal Audit and Corporate Governances since April 2013.  Kotowski reports directly to the Audit Committee of the Board of Directors of NVR.

67.     Kotowski reviews NVR's filings with the Securities and Exchange Commission before they are filed, including its Annual Report on Form 10-K and

its Proxy Statement distributed to all shareholders in connection with the solicitation of votes on matters presented at the Annual Meeting of Shareholders.

68.     NVR's Annual Report on Form 10-K describes as a major risk factor the protection of its confidential, proprietary, and trade secret information.  The Annual Report states that if NVR fails to safeguard such information, it would damage its competitive position, business and reputation.  A copy of the relevant portion of NVR's 2014 Annual Report is attached hereto as Exhibit 6 [Davern000021-000031].

69.     The Audit Committee of the Board of Directors is responsible for, among other things, overseeing risks to which NVR is subject, and according to NVR's 2015 Proxy Statement to Shareholders, the Audit Committee approves an annual internal audit plan "prepared using a comprehensive risk-based approach" and "[m]anagement reports to the Audit Committee any matter concerning a violation of Our Code of Ethics or our Standards of Business Conduct." A copy of NVR's 2015 Proxy Statement is attached as Exhibit 7 [Exhibit D-88].

70.     The Code of Ethics and Standards of Business Conduct also require that violations of those policies be promptly reported by management to the Audit Committee.

71.     NVR has never performed an internal audit on the adequacy of its policies, practices, and procedures for safeguarding information it considers to be confidential, proprietary, or trade secret.

72.     Kotowski supervises the Internal Audit Department, serves as secretary to the Audit Committee, and attends all Audit Committee meetings.

73.     After Kotowski learned Davern had forwarded certain emails to his personal email account before resigning on June 15, 2015, Kotowski investigated, as described above, that aspect of Davern's conduct and also undertook to investigate whether Davern was involved in the deletion of certain Land Files, which occurred on or about May 29, 2015.

74.     In conjunction with this aspect of the internal investigation, Kotowski was surprised to learn that every employee of the Division Office had access to the server containing the Land Files that had been deleted.

75.     Kotowski also learned that there was no way to determine who accessed the files that were deleted.

76.     Kotowski learned that there was no record that Davern had logged into the NJS Homebuilding File Server during that period and going back to March 11, 2015.  [Exhibit D- 80].

77.     Kotowski also learned that there was no record of Davern gaining remote access to the NVR servers between May 29, 2015 and June 1, 2015.

17

78.     Kotowski also learned that Davern had not physically accessed the offices of the New Jersey South Division between May 29, 2015 and June 1, 2015.

79.     Kotowski later reviewed the NVR Complaint before it was filed and at the time he reviewed the draft Complaint he had not discovered any information that Davern was the person who deleted the land files.

80.     Despite the extent of his knowledge about the nature and amount of information in the possession of Davern at the time he left NVR, as of December 15, 2015, neither Kotowski, the Chief Ethics Officer, the Chief Legal Officer, nor any other member of management had informed the Audit Committee about what NVR contends were unprecedented violations of NVR's Code of Ethics, Standards of Business Conduct, and other policies that supposedly posed a risk of irreparable harm to NVR.

## V.     Forensic Analysis of Davern's Email Accounts and Storage Devices

81.     After Davern's resignation and immediately after the initiation of this litigation, Davern's counsel, as promised, delivered to NVR's counsel, among other things, a 64 GB SanDisk portable USB storage device ("64 GB USB Drive"), and a 128 GB PNY portable USB storage device ("128 GB USB Drive").

82.     Innovative Discovery, LLC ("Innovative"), a provider of legal document solutions, took custody of, among other things, the 64 GB USB Drive and 128 GB USB Drive for forensic analysis on or about July 16, 2015.  Innovative

18

also collected the contents of email accounts from Davern, including email accounts that Davern maintained at Comast.net ("Comcast Account") and Gmail.com.  These email addresses were jon.davern@comcast.net and jon.davern@gmail.com, respectively.  After Davern provided the necessary authentication passwords for each, Innovative preserved the contents of each mailbox.

## VI.    The Alleged Trade Secret Information

83.    NVR admits that Davern was authorized to access all of the electronically stored information of NVR as an employee of NVR.

84.    NVR admits that Davern did not hack into its computer systems.

85.    The list of land opportunities that Davern provided in an email to Doug Brown of Horton on June 1, 2015 was derived from public records, land brokers, and other sources outside of NVR and cannot be trade secret information of NVR.

86.    After NVR learned in early September 2015 about the Doug Brown email, which it claims constitutes NVR's trade secrets, it did not make any effort to obtain the return of the list of land opportunities and other information Davern had provided to Brown.  Indeed, as of the deposition of NVR's corporate designee on November 18, 2015, NVR had not made any oral or written request to Horton that

Horton not use and return to NVR any information that had come into its possession as a result of its dealings with Davern.

87.     NVR acquires land for home building by use of Lot Purchase Agreements, with standardized provisions.  An innumerable number of NVR Lot Purchase Agreements have been provided to third party property owners, developers, land brokers, and many others.

88.     Although NVR contends that the terms of its Lot Purchase Agreement are trade secret, during the deposition of NVR, its General Counsel admitted to authorizing filing a copy of one of its Lot Purchase Agreements in the public docket of the United States District Court for the Eastern District of Pennsylvania.

89.     Even though the General Counsel participated in drafting the form of NVR's Lot Purchase Agreement, he falsely testified that NVR's standard Lot Purchase Agreement contains a confidentiality provision restricting disclosure of its contents to others.  In fact, NVR's standard form of Lot Purchase Agreement does not contain any confidentiality provision limiting in any way disclosure of its contents to third parties and accordingly cannot possibly constitute trade secret information of NVR.

90.     Although NVR contends that its phone directory is a trade secret, after NVR learned in early to mid-September that Davern had provided The Rio Group

with a copy of the NVR phone Directory, NVR did not demand that the Rio Group return or destroy all copies of the NVR phone directory.

91.     The forensic examination performed on Davern's digital devices and email accounts did not reveal that Davern accessed any of the NVR information in his possession after he ceased to be employed by NVR.

92.     NVR has admitted that it has no evidence that Davern has used any information that NVR contends Davern took from NVR.

## VII.   NVR has suffered no damages and there is no likelihood of irreparable harm

93.     NVR has admitted during its deposition that it has not lost any sales or land opportunities as a result of Davern's alleged misappropriation of its trade secrets.

94.     NVR has admitted that it has not lost any employees to Horton based on any conduct of Davern or otherwise since Davern resigned from NVR.

95.     NVR has admitted during its deposition that the forensic analysis of Davern's digital devices and email accounts indicates that after he resigned he did not access any NVR information residing on such digital devices or in such email accounts.

96.     NVR has admitted that the sole basis for its concern that Davern may have hard copies of NVR information or that he may use or disclose confidential, proprietary or trade secret information of NVR to its competitive disadvantage in

the future if not enjoined is "speculation", "fear" and "suspicion" See Exhibit 8

[NVR transcript cover page and. p. 344:4-23].

97.     Even though Davern is not subject to a non-compete or non-

solicitation agreement, he has assured NVR that Horton will not pursue any of the

land opportunities Davern identified in his email to Doug Brown on June 1, 2015

nor will he solicit any employee of NVR to become an employee of Horton.

## VIII.  The Alleged Trade Secret Information and NVR's Misrepresentations of it to Prejudice Davern

98.     Since filing the Complaint, NVR has been claiming Davern took

"more than 97,000 documents and emails to himself containing NVR's

confidential, proprietary and trade secret information for his own benefit."  See

Amended Complaint, ¶ 139.

99.     NVR made similar allegations in most of its court filings in this

litigation.

100.    What NVR failed to disclose is that out of this "97,000 documents and

emails" that purportedly constitute "NVR's confidential, proprietary and trade

secret information," NVR designated in discovery only 29,042 of these documents

as its trade secrets, confidential information, or proprietary information.

101.    In other words, about 70,000 of the 97,000 documents that Davern

allegedly took were Davern's personal documents and emails.

22

102.   Furthermore, even a cursory review of the 29,092 of the documents that NVR designated as its alleged trade secret, confidential information, or proprietary information, reveals that most of these "confidential" documents are far from any confidential information, let alone trade secret.

103.   Document Bates No. NVR00003069, for instance, which NVR designated as both its trade secret, confidential information, *and* proprietary information, is NVR's advertisement for NVR homes for sale.  This advertisement was widely circulated to the public.  This advertisement was freely given to the public.  This advertisement invites anyone interested in buying NVR homes to call NVR using the numbers contained in the advertisement.

104.   Yet, NVR designated this advertisement as its trade secret that Davern allegedly stole.

105.   Some of NVR's improper designations of documents as trade secrets, confidential information, or proprietary information are more extreme.  In fact, some of NVR's improper designations of documents sometimes are outright abusive.

106.   Document Bates No. NVR00004569, for instance, which NVR designated as both its trade secret, confidential information, *and* proprietary information, is in fact NVR's logo that says "Ryan Homes" and nothing more.  This alleged trade secret document contains nothing but these two words that are

23

used in public advertisement for all NVR homes marked under the name "Ryan Homes."

107.   Yet, NVR designated this logo as its trade secret, confidential information, and proprietary information.

## COUNT I
## TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE RELATIONSHIPS

108.   Davern incorporates herein by reference the allegations contained in all of the above paragraphs above as though set forth in their entirety.

109.   Davern and Horton have a contractual relationship with each other, both existing and prospective.

110.   While employed by NVR, Davern was considered a highly successful and capable employee and manager, which NVR admitted on the record at the Preliminary Injunction hearing.

111.   Since Davern resigned from NVR and became an employee of Horton, NVR has repeatedly contacted Horton for the purpose of causing Horton to terminate Davern.  For example, right after filing this lawsuit, NVR's General Counsel contacted the General Counsel for Horton to inform him about the lawsuit.

112.   NVR's General Counsel testified during his deposition that he called Horton's General Counsel because he did not think Horton's General Counsel knew about the "vast number of documents" that Davern took from NVR.

24

113. While telling Horton's General Counsel about the "vast number of documents" that Davern took from NVR, NVR's General Counsel did not disclose that over 70% of these documents were Davern's personal documents.

114. Similarly, NVR's General Counsel did not disclose that the alleged trade secrets that Davern took from NVR include many public materials, such as NVR's advertisements and logos, which are widely circulated to the public.

115. Furthermore, even though NVR knew at that time that Davern possessed what it claimed to be its confidential, proprietary, or trade secret information, in that conversation, the General Counsel did not ask Horton to return or not to use any confidential or trade secret information in the possession of Davern.

116. Davern believes the sole purpose of contacting the General Counsel of Horton was to cause Horton to terminate Davern.

117. During the deposition of Davern on October 30, 2015, portions of the deposition were designated by Davern's counsel as "confidential" in accordance with the agreed upon Confidentiality Order entered in this lawsuit. After the deposition, NVR's counsel contacted Davern's counsel requesting that the confidential designations be removed, not because they were not in accordance with the Confidentiality Order, but because NVR's counsel wanted to show those portions of Mr. Davern's deposition transcript to Horton.

25

118.   Davern believes the only reason for seeking to show Horton Davern's deposition transcript was to cast Davern in such an unfavorable light that Horton would terminate Davern, thereby eliminating a capable manager knowledgeable about the New Jersey home building market.

119.   Later, NVR's counsel wrote a letter to Horton addressed jointly to its President, CEO and General Counsel obliquely suggesting that while it had thus far endeavored to not burden Horton or embroil it in this litigation, going forward, that might not be possible.  The clear import of the letter was that if Horton terminated Davern, it would not be burdened by this litigation.  A copy of this letter is attached hereto as Exhibit 9.

120.   NVR has needlessly pursued this litigation and deliberately escalated its costs and the demands upon the time of Davern that would otherwise be available to perform his job responsibilities for Horton, even though it knows all NVR information in the possession of Davern has been returned, solely for the purpose of causing Horton to terminate Davern, thereby eliminating a capable, knowledgeable manager from the New Jersey market.

121.   NVR sought and obtained a preliminary injunction against Davern as part of a strategy to limit his effectiveness as a manager of Horton, even though NVR knows that extensive information covered by the preliminary injunction is not confidential, proprietary, or trade secret.  Davern believes NVR sought the

26

preliminary injunction, not because of any genuine fear or risk that it likely would suffer irreparable harm, but because it believed the preliminary injunction would limit Davern's ability to perform his job responsibilities on behalf of Horton.

122.  Davern believes that Plaintiff has contacted Horton at least four times regarding Davern all of which have been improper and interfered and continue to interfere with Davern's relationship with Horton.  Specifically, NVR's tortious conduct prevented Davern from performing his duties for Horton fully and completely, which effectively limited Davern's impact at Horton.

123.  NVR has acted purposely and with malice and the intent to injure Davern and his contractual relationship with Horton.

124.  NVR has caused Davern to suffer financial injury and diminished Davern's reputation with Horton.

125.  Accordingly, Davern seeks and is entitled to injunctive relief stopping NVR from continuing their improper conduct and to damages in an amount to be determined at trial.

126.  NVR's acts were intentional, willful, wanton, and/or reckless, warranting imposition of punitive damages against it.

**WHEREFORE**, Davern demands judgment against NVR for:

(a).  An award of compensatory damages in an amount in excess of the jurisdictional amount of $75,000;

(b).     Punitive damages;

(c).     Injunctive relief enjoining NVR from continuing their tortious interference with the relationship between Davern and Horton; and

(d).     Such other relief as the Court deems just and proper.

### COUNT II
### ABUSE OF PROCESS

127.   Davern incorporates herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

128.   As alleged above, NVR instigated this lawsuit against Davern notwithstanding the fact that before filing suit, NVR knew that Davern had agreed to return all NVR information in his possession and had in fact turned over to counsel all his digital devices for this purpose.

129.   NVR was motivated to file this lawsuit for the improper purpose of seeking to enjoin Davern based on its concern that he was a highly capable manager who would help Horton compete effectively with NVR in the tristate area of New Jersey, Pennsylvania and Delaware.

130.   One of the main purposes of filing this lawsuit was to further NVR's effort to maintain a dominate market position in New Jersey, which is an important part of its business strategy as described in its publicly filed Annual Report on Form 10-K.

131.   As alleged above, NVR used the Complaint as a basis to communicate

28

with Horton for the purpose of seeking to cause Horton to terminate Davern.

132.   As alleged above, the Complaint and NVR's motion for TRO and Preliminary Injunction contain knowingly false representations about Davern, the Code of Ethics, the deletion of certain Land Files, and the capabilities of NVR's proofing software and other security measures, among others.

133.   Despite that NVR's counsel was aware of numerous factual errors in the Complaint, the motion for TRO and Preliminary Injunction and supporting declarations before the Preliminary Injunction hearing on December 15, 2015, NVR did not correct the record with the Court at the time of the hearing.  The Court relied upon certain of these material factual inaccuracies in its opinion granting the Preliminary Injunction.

134.   In anticipation of the December 15, 2015 Preliminary Injunction hearing, NVR's counsel requested, by letter dated December 3, 2015, that Davern "agree to designate portions of certain deposition transcripts into evidence prior to the hearing."  Counsel explained that "[t]o the extent that a witness's deposition testimony will suffice in lieu of live testimony, we suggest incorporating relevant portions of the witness's transcript . . . which would obviate the need to call that witness at the hearing."  A copy of this letter is attached as Exhibit 10.

135.   In the same letter, NVR's counsel requested that the parties seek to agree upon a joint stipulation of facts before the hearing.  *Id.*

136.   Based upon these requests, Davern prepared and submitted to NVR's counsel designations of portions of the deposition transcripts of NVR, Dylan Sinclair, Michael Kotowski and Timothy Richardson.  Davern also prepared and submitted to NVR's counsel proposed joint stipulated facts.

137.   Contrary to counsel's previous representations and requests, counsel for NVR rejected most of Davern's proposed stipulated facts and proposed designations of portions of deposition transcripts.  Instead, at the Preliminary Injunction hearing, NVR's counsel castigated Davern for doing precisely what NVR had requested and objected to the Court that it would be improper to substitute designations of portions of deposition transcripts in lieu of taking testimony from witnesses.  PI Transcript, p. 11.

138.   The effect of the gambit by NVR's counsel to solicit stipulated facts and designations of portions of deposition transcripts from Davern was to impose undue burdens on Davern on the eve of the Preliminary Injunction hearing and then to cast Davern's counsel in a poor light in front of the Court with respect to the very circumstances brought about by NVR's counsel.

139.   At the Preliminary Injunction hearing, NVR's counsel represented to the Court that Davern "stole 90,000 documents from NVR."  While making this representation, NVR's counsel did not disclose that over 70% of these documents were Davern's personal documents.

30

140.    Similarly, NVR's counsel did not disclose that the alleged trade secrets that Davern took from NVR include many public materials, such as NVR's advertisement and logos, which are widely circulated to public.

141.    At the conclusion of the Preliminary Injunction hearing, the Court described what it characterized as a "very narrow" scope of preliminary injunction it would enter and invited counsel to draft a form of Preliminary Injunction for this purpose.

142.    Contrary to the Court's direction, NVR's counsel prepared a form of Preliminary Injunction that was overbroad, far exceeding the scope of the previous Consent Order, which the Court entered without change.

143.    After obtaining the Preliminary Injunction, NVR prepared and filed an Amended Complaint that alleges, at paragraph 88, that it engaged a third party investigator to inspect all of the digital devices of Davern but omits to disclose that this third party investigator determined that no NVR information residing on such digital devices had been accessed by Davern after leaving NVR.

144.    NVR omitted to disclose this material information to the Court for the purpose of furthering its agenda of pursuing this litigation as part of a strategy of restricting competition by Davern and Horton in the tristate area. Doc. No. 82 at 19 of 32.

145.    The above described conduct by NVR constitutes the willful use of

31

legal process that is not proper in the regular conduct of those legal proceedings.

146.    Such conduct has caused injury to Davern's reputation, his relationship with Horton and third parties, imposed costs upon Davern and Horton and inflicted emotional distress upon Davern.

147.    NVR's acts were intentional, willful, wanton, and/or reckless, warranting imposition of punitive damages against it.

**WHEREFORE**, Davern demands judgment against NVR for damages in excess of $75,000, plus interest, costs of suit, and punitive damages for its intentional, willful, wanton and/or reckless conduct, and for such other relief as the Court deems equitable and just.

## COUNT III
## DEFAMATION

148.    Davern incorporates herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

149.    As alleged above, NVR used this litigation as basis to communicate with Horton for the purpose of seeking to cause Horton to terminate Davern.

150.    In its communications to Horton, both written and oral, NVR falsely stated that Davern stole 97,000 documents constituting NVR's trade secrets or confidential information.

151.    The statements were false as over 70,000 of these documents were Davern's personal documents.

32

152.    The statements were also false as even most of the remaining documents that belong to NVR did not constitute any trade secret or confidential information.  These documents were NVR's advertisements, logos, other advertisement materials, and other publicly available documents such as the Lot Purchase Agreement that was in the public domain.

153.    NVR omitted to disclose this material information to Horton for the purpose of characterizing Davern as a dishonest person who should not be trusted.

154.    The false and defamatory statements made by NVR concerning the personal, professional, and business reputation and character of Davern were made maliciously and with intent to destroy Davern's professional reputation and career.

155.    NVR was completely reckless about the statements' falsity when it made the statements to Horton.

156.    In fact, NVR knew the statements were false when it made the statements to Horton.

157.    The statements made by NVR denigrated Davern's reputation, and accused him of engaging in criminal conduct, and are therefore defamatory per se under New Jersey law.

158.    NVR's conduct has caused injury to Davern's reputation, his relationship with Horton and third parties, imposed costs upon Davern and Horton and inflicted emotional distress upon Davern.

33

159.   NVR had no right or privilege to make such false statements to Horton.

160.   NVR's acts were intentional, willful, wanton, and/or reckless, warranting imposition of punitive damages against it.

**WHEREFORE**, Davern demands judgment against NVR for damages in excess of $75,000, plus interest, costs of suit, and punitive damages for its intentional, willful, wanton and/or reckless conduct, and for such other relief as the Court deems equitable and just.

KANG HAGGERTY & FETBROYT LLC

By:   */s/ Edward T. Kang*
Edward T. Kang
Daniel D. Haggerty
Gregory H. Mathews (*pro hac*)
David P. Dean (*pro hac*)
123 S. Broad Street, Suite 1670
Philadelphia, PA 19109
ekang@LawKHF.com
dhaggerty@LawKHF.com
gmathews@LawKHF.com
ddean@LawKHF.com
(215) 525-5850
(215) 525-5860 (fax)
*Attorneys for Defendant/Counterclaim*
*Plaintiff Jonathan Davern*

Dated: February 5, 2016

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                              :
NVR, INC.,                                    :   CIVIL ACTION
                                              :
                    Plaintiff,                :   No. 1:15-cv-05059-NLH-KMW
                                              :
        v.                                    :
                                              :
JONATHAN DAVERN,                              :
                                              :
                    Defendant.                :
_____            :

## CERTIFICATE OF SERVICE

I, Edward T. Kang, hereby certify that on November 30, 2016, a true and

correct copy of Defendant's Counterclaims against Plaintiff NVR, Inc. dated

February 5, 2016 has been filed electronically and may be viewed and/or

downloaded through the ECF system maintained by the Clerk of the United States

District Court for the District of New Jersey.  The following counsel representing

the following party will receive electronic notification:

James S. Yu, Esquire
Seyfarth Shaw LLP
620 East Avenue
New York, NY 10018

Barry J. Miller, Esquire
Lauren S. Wachsman, Esquire
Seyfarth Shaw LLP
2 Seaport Lane, #300
Boston, MA 02210

Robert A. Mintz, Esquire
Thomas E. Doherty, Esquire
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NY 07102


*/s/ Edward T. Kang*
Edward T. Kang

Dated:  November 30, 2016

2